**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| gh PACKAGE PRODUCT TESTING AND CONSULTING, INC., 4090 Thunderbird Lane Fairfield, OH 45014 *Plaintiff*, v. PETER M. BUTTIGIEG, Secretary, U.S. Department of Transportation, in his official capacity, 1200 New Jersey Avenue, S.E. Washington, D.C. 20590-0001 -and- TRISTAN BROWN, Acting Administrator, Pipeline and Hazardous Materials Safety Administration, U.S. Department of Transportation, in his official capacity, 1200 New Jersey Avenue, S.E. Washington, D.C. 20590-0001, -and- U.S. DEPARTMENT OF TRANSPORTATION, 1200 New Jersey Avenue, S.E. Washington, D.C. 20590-0001 *Defendants*. | CIVIL CASE NO. _____ **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** JURY TRIAL DEMANDED |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff gh Package Product Testing and Consulting, Inc. ("gh") brings this complaint for declaratory and injunctive relief, alleging as follows:

## PRELIMINARY STATEMENT

1.      This action seeks to stop Defendant U.S. Department of Transportation ("DOT") from subjecting Plaintiff to an illegitimate administrative enforcement proceeding that violates Article II of the United States Constitution, the Due Process Clause of the Fifth Amendment, and the Seventh Amendment's guarantee of the right to trial by jury.

2.      On November 10, 2022, the Pipeline and Hazardous Materials Safety Administration ("PHMSA")—an agency within DOT—brought an administrative enforcement proceeding to assess a $24,612 civil penalty against Plaintiff for submitting certain test reports that the agency alleges were inaccurate in some respects and that violated DOT regulations. Notably, PHMSA did not allege that Plaintiff knew or should have known about the alleged inaccuracies, even though the statute authorizes the assessment of a civil penalty only against a person who "knowingly violates" a regulation. 49 U.S.C. § 5123(a). And at least some of the allegations are clearly time-barred under 28 U.S.C. § 2462's five-year statute of limitations for civil penalties.

3.      PHMSA initiated this meritless enforcement action because it knows it will prevail in DOT's in-house administrative proceedings, where the deck is decisively and unconstitutionally stacked in its favor.

4.      To start, agency adjudicators who preside over DOT's in-house proceedings are all illegitimate under *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010), because they enjoy multiple layers of protection from removal by the President. They are also illegitimate under *Lucia v. SEC*, 138 S. Ct. 2044 (2018), because they were never lawfully appointed by the President or a department head.

5.     Next, DOT's administrative proceedings lack any provision for trial by jury on questions of fact that can lead to punitive sanctions. They thus violate the Seventh Amendment's guarantee of the right to a jury trial for any enforcement action seeking a civil penalty.

6.     Finally, DOT's administrative proceedings are fundamentally unfair because agency officials simultaneously act as both prosecutor and judge. And the accused lacks basic due-process protections needed for a fair tribunal, such as a duty by the prosecutor to disclose exculpatory evidence as a matter of course. The proceedings therefore violate the Due Process Clause of the Fifth Amendment.

7.     Subjecting Plaintiff to an unconstitutional tribunal is a "here-and-now injury[,]" *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 893 (2023), that inflicts imminent, ongoing, and irreparable injury.

8.     This Court should declare DOT's administrative civil-penalty proceedings unconstitutional and enjoin the agency from prosecuting Plaintiff in such a proceeding.

## PARTIES

9.     Plaintiff gh Package Product Testing and Consulting, Inc. is a family-owned Ohio corporation with its headquarters located in Fairfield, Ohio. It employs 5 people and is regulated by PHMSA as a third-party laboratory that offers testing services to customers involved in the transportation of hazardous materials.

10.     Defendant Peter Buttigieg is sued in his official capacity as Secretary of the U.S. Department of Transportation ("Secretary").

11.     Defendant Tristan Brown is sued in his official capacity as Acting Administrator of the Pipeline and Hazardous Materials Safety Administration.

12.     Defendant U.S. Department of Transportation is an agency of the United States.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 1367 and 2201.

14.    This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and under its inherent equitable powers.

15.    Venue is proper within this district pursuant to 28 U.S.C. § 1391. Defendants are United States agencies or officials sued in their official capacities. Plaintiff has its principal place of business in this judicial district and substantial parts of the events or omissions giving rise to the Complaint occurred within this district.

## STATEMENT OF FACTS

### I.    LEGAL BACKGROUND

16.    The Hazardous Materials Transportation Act ("HMTA"), Pub. Law. No. 93-633, 88 Stat. 2156, 2160 (Jan. 3, 1975), authorizes the Secretary to promulgate regulations for "the safe transportation … of hazardous material in … commerce." 49 U.S.C. § 5103(b)(1). Such regulations are known as the Hazardous Materials Regulations ("HMR").

17.    The HMR are codified at 49 C.F.R. Parts 171-180 and consist of 1,250 pages of detailed requirements governing every aspect of hazardous materials transportation. These requirements range from the manufacture, certification and sale of myriad sizes and shapes of packaging products designed to contain hazardous ladings, to the preparation, labeling and marking of packages.

18.    The HMTA further authorizes the Secretary to seek from any "person that knowingly violates this chapter or a regulation … issued under this chapter … a civil penalty of not more than $75,000 for each violation." 49 U.S.C. § 5123(a)(1). A "knowing" violation occurs

where "(A) the person has actual knowledge of the facts giving rise to the violation; or (B) a reasonable person acting in the circumstances and exercising reasonable care would have that knowledge." *Id.*

19.     The Secretary may impose penalties for HMR violations only after the accused has been provided notice and an opportunity for a hearing. *Id*. § 5123(b).

20.     PHMSA was created within DOT by the Norman Y. Mineta Research and Special Programs Improvement Act of 2004, Pub. L. 108-426. The authority to assess civil penalties for HMR violations is delegated to the PHMSA Administrator. 49 C.F.R. § 1.97(b).

21.     PHMSA's Chief Counsel is authorized to "initiate proceedings to assess a civil penalty" against any person whom he has "reason to believe … has knowingly engaged in conduct which is a violation of the [HMR]." 49 C.F.R. § 107.307(a)(2). As interpreted by PHMSA, this regulation merely requires the target of an enforcement proceeding to knowingly engage in some conduct—here, the filing of reports—which happens to violate the HMR. Thus, enforcement actions may be brought without evidence that the target knew or should have known that its conduct violated the HMR.

## II.     PHMSA'S ADMINISTRATIVE ADJUDICATION SCHEME

22.     The Chief Counsel initiates a proceeding to assess a civil penalty for HMR violations by serving the accused with a Notice of Probable Violation that sets forth the agency's allegations and the proposed penalty amount. 49 C.F.R. § 107.311.

23.     Within 30 days of receiving a notice of probable violation, the accused must either admit the alleged violation, make an "informal response," or request a formal hearing. *Id.* § 107.313(a).

24.     An "informal response" consists of correspondence, explanations, arguments, and offers of settlement presented to the same PHMSA Chief Counsel who has already decided to assess a civil penalty against the accused. *Id*. § 107.317(a).

25.     A "formal hearing" is conducted before a DOT administrative law judge ("ALJ") who acts as the finder of law and fact. *Id.* § 107.321. There is no provision for facts to be determined by a jury.

26.     DOT's ALJs are "Officers of the United States" who must be appointed by the President or the Secretary. *Lucia*, 138 S. Ct. 2044.

27.     Following the *Lucia* decision, a memorandum from the Solicitor General instructed DOT (among other federal agencies) how to ratify the defective appointments of agency adjudicators. *See* Memorandum from Solicitor General to Agency Gen. Couns., Guidance on Admin. Law Judges after *Lucia v. SEC* (S. Ct.), July 23, 2018. The Solicitor General advised that, to avoid future litigation about the legitimacy of ALJs, "it would be fitting for ratifications to be accompanied by an appropriate degree of public ceremony or publicity." *Id.* at 6.

28.     The Office of the Solicitor General more recently told the Supreme Court that "if an agency … had flouted *Lucia* and in the wake of *Lucia* had continued to conduct adjudications through ALJs who had not been appointed in conformity with the Appointments Clause, then mandamus review could have been granted." Transcript of Oral Argument at 68-69, *Axon Enter., Inc. v. FTC*, No. 21-86 (U.S. Nov. 7, 2022).[1]

29.     Even after *Lucia*, federal regulations required all ALJ appointments to be approved by the Office of Personnel and Management ("OPM"). 5 C.F.R. § 930.204(a).

---

[1] Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-86_4f15.pdf (last visited June 26, 2023).

30.     Upon information and belief, President Trump's Secretary of Transportation, Elaine Chao, purported to ratify or otherwise appoint both of DOT's pre-*Lucia* ALJs.  Neither Chao nor her successor, Defendant Buttigieg, ever publicly announced such ratifications or appointments. As such there is no way for Plaintiff—or any other member of the public—to know whether a particular ALJ or other decisionmaker in a civil penalty proceeding has been appointed, and if so, by whom.

31.     DOT's ALJs may be removed only for good cause as determined by the Merit Systems Protection Board ("MSPB"), 5 U.S.C. § 7521(a). The Secretary, who has power of appointment over ALJs, cannot remove an ALJ without approval from MSPB. MSPB board members themselves can be removed by the President only for good cause. 5 U.S.C. § 1202(d).

32.     Accordingly, when the Secretary purported to ratify the appointment of DOT's pre-*Lucia* ALJs, he or she lacked power to remove those ALJs without cause. 5 U.S.C. § 7521(a). Nor did he or she have power to appoint new ALJs who were not already approved by OPM. 5 C.F.R. § 930.204(a).

33.     After considering the matter in a formal hearing, DOT's ALJs must issue an order dismissing the enforcement action or assessing a civil penalty, which is enforceable in federal courts unless the accused files a timely administrative appeal. 49 C.F.R. § 107.323.

34.     A party that is adversely affected by an ALJ's decision—either the accused or the agency—may file an administrative appeal to the PHMSA Administrator.  *Id.* § 107.325(a), (b).

35.     PHMSA has had no Senate-confirmed Administrator since January 2021. So, PHMSA has subdelegated the authority to adjudicate administrative appeals of ALJ decisions to another agency employee who acts as final agency adjudicator, though no regulation nor even an agency guidance document reflects such sub-delegation.

36.     An administrative appeal consists of the parties filing written submissions to the agency adjudicator, who then issues a decision on appeal that constitutes the final agency action on the matter. *Id.* § 107.325(a), (b).

37.     Since at least January 2017, PHMSA has purported to subdelegate the authority to adjudicate administrative appeals to PHMSA's Chief Safety Officer, Howard McMillan, who is a member of the Senior Executive Service ("SES"). Mr. McMillan simultaneously serves as PHMSA's Executive Director and, in that capacity, he oversees all agency operations, which includes the enforcement action against Plaintiff.

38.     SES members may be removed only for good cause as determined by the MSPB. 5 U.S.C. § 7543(a), (b), (d). MSPB members may be removed by the President only for good cause.

5 U.S.C. § 1202(d).

39.     PHMSA's Chief Safety Officer, who adjudicates civil-penalty cases, and its Chief Counsel, who prosecutes civil-penalty cases, serve on the same agency "senior leadership team."[2]

40.      The Chief Safety Officer's decision on appeal is a final agency action that may be reviewed in federal appellate court. 49 U.S.C. § 5127(a).

41.     A review of administrative decisions on appeal published on DOT's website and on regulations.gov shows that, since 2017, Chief Safety Officer McMillan affirmed the finding of violations sought by his teammate, the agency Chief Counsel, in 18 out of 18 cases.[3]

---

[2] Dep't of Transp., PHMSA Leadership (last visited June 26, 2023), https://www.phmsa.dot.gov/about-phmsa/leadership.

[3] Dep't of Transp. PHMSA Decisions on Appeal, https://www7.phmsa.dot.gov/enforcement-order-type/decisions-appeal (last visited June 26, 2023). The agency's website appears missing several decisions which can be found on regulations.gov, including: *In the Matter of: Dynasty Enterprises, LLC d/b/a Dynasty Propane*, PHMSA-2021-0001 (May 5, 2021), https://www.regulations.gov/document/PHMSA-2021-0001-0002; *In the Matter of Polyweave Packaging, Inc.,* PHMSA-2020-0079, Oct. 19, 2021, https://www.regulations.gov/document/PHMSA-2020-0079-0002; and *In the Matter of: Metal Conversion Technologies, LLC,* PHMSA-2021-0088 (July 25, 2022); https://www.regulations.gov/document/PHMSA-2021-0088-0002.

42.     On July 22, 2022, DOT's court filings in a different case revealed—for the first time publicly—that the Chief Safety Officer never previously had authority to adjudicate administrative enforcement cases. *See* Motion to Vacate and Remand, *Polyweave Packaging, Inc. v. U.S. Department of Transportation*, Case No. 21-4202, Doc. 29 (filed July 22, 2022) (Exhibit 1). DOT conceded the Chief Safety Officer "had not been appointed by the President, a court of law, or a head of department," *id.* at 2, as required under *Lucia*, and therefore had been unlawfully adjudicating administrative appeals for years.

43.     DOT claims that the Chief Safety Officer has since been appointed by the Secretary but, instead of publicly announcing such appointment, has refused to provide any evidence that the appointment occurred.[4] As such there is no way for Plaintiff—or any other member of the public—to confirm whether (and when) the Secretary (or another lawful authority) appointed the Chief Safety Officer.

44.     Even if the Secretary lawfully appointed the Chief Safety Officer, he cannot remove the Chief Safety Officer without cause. 5 U.S.C. § 7543(a), (b), (d).

45.     On February 15, 2019, DOT's then-General Counsel issued a memorandum entitled *Procedural Requirements for DOT Enforcement Actions* (Feb. 15, 2019) (the "Bradbury Memo"), attached as Exhibit 2.

46.     The purpose of the Bradbury Memo was "to ensure that DOT enforcement actions satisfy principles of due process[.]" *Id.* at 1. It did so by establishing due-process requirements that

---

[4] On August 12, 2022, the New Civil Liberties Alliance filed a request under the Freedom of Information Act requesting that DOT provide details regarding Mr. McMillan's and other agency adjudicators' appointments as Officers of the United States. *See* Dep't of Transp. Letter from Darlene A. Wallace to Kara Rollins, Aug 12, 2022 (Exhibit 3).  But DOT has not responded to that request.

would apply to all DOT enforcement actions, including the duty to disclose exculpatory evidence to the accused "as a matter of course" under *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 9-10.

47.    On December 27, 2019, DOT codified the due-process protections articulated in the Bradbury Memo—including the *Brady* disclosure duty—at 49 CFR Part 5 Subpart D. *Administrative Rulemaking, Guidance, and Enforcement Procedures*, 84 Fed. Reg. 71,714, 71,716 (Dec. 27, 2019).

48.    On April 2, 2021, DOT purported to rescind Subpart D's due-process safeguards. *Administrative Rulemaking, Guidance, and Enforcement Procedures*, 86 Fed. Reg. 17,292, 17,293 (Apr. 2, 2021). It said the Bradbury Memo's due-process protections "need not be adopted by regulation in order to be effective" and "can be accomplished by internal directives." *Ibid.*

49.    DOT has maintained that it rescinded Subpart D merely for cosmetic reasons and therefore the Bradbury Memo's due-process protections continued to apply even after the rescission.

50.    DOT thereafter maintained the Bradbury Memo on its website for the public to view and rely upon until it deactivated the web link in April 2023.[5]

51.    In September 2022, DOT ALJ Douglas M. Rawald told counsel at a hearing in a different case that "the Bradbury Memo has been rescinded and there is new guidance under the Buttigieg leadership of the Department regarding enforcement of due process." *See In the Matter of: Axalta Coating Systems*, Hearing Transcript at 19-20 (Sep. 20, 2022) (Exhibit 4).  At that time, however, the Bradbury Memo was clearly published on DOT's website as the current enforcement policy.[6] At that time, no new guidance was published on DOT's website to suggest otherwise.

---

[5] This link briefly reactivated in May 2023 before being deactivated again.
[6] *See* Screenshot taken of DOT Website on Oct. 6, 2022 (Exhibit 5).

52.     In April 2023, DOT took the Bradbury Memo off its website and made public for the first time a memorandum from General Counsel John E. Putnam that "rescinds and replaces" the Bradbury Memo. *See Department of Transportation Enforcement Policies and Principles*, (Sep. 6, 2022) (the "Putnam Memo").[7]

53.     The Putnam Memo eliminated many of the Bradbury Memo's safeguards, including the duty to disclose exculpatory evidence as a matter of course.

54.     While the Putnam Memo was dated September 6, 2022, it was not made public until April 2023.

55.     DOT thus purported to rescind the Bradbury Memo *sub silentio* and replaced it with new civil-enforcement guidelines that fail to mention *Brady* rights and other due process protections for respondents in the Department's civil penalty proceedings.

## III.     DOT'S ADMINISTRATIVE CIVIL-PENALTY ACTION AGAINST PLAINTIFF

56.     Plaintiff is a third-party laboratory that performs tests on designs of hazardous materials packages to ensure they comply with HMR requirements.

57.     From September 2017 to November 2020, Plaintiff operated under competent authority approval under 49 C.F.R. § 107.403 to perform such tests and certify packaging as meeting certain HMR requirements. *See* Competent Authority Approval (Exhibit 6).

58.     Plaintiff was required under its Competent Authority Approval to submit reports to DOT for packaging designs it tested. *Id.* at 4.

59.     DOT reviewed and approved Plaintiff's test reports at the time they were submitted, sometimes with requested revisions and modifications.   DOT reviewers never suggested that

---

[7] Available at: https://www.transportation.gov/administrations/office-general-counsel/general-counsel%E2%80%99s-enforcement-memorandum (last visited June 26, 2023).

Plaintiff falsified any test results or submitted inaccurate results during the term of Plaintiff's Competent Authority Approval.

60. Plaintiff's Competent Authority Approval expired in November 2020 and has not been renewed.

61. Two years after expiration, on November 10, 2022, PHMSA's Chief Counsel served on Plaintiff a Notice of Probable Violation assessing a civil penalty of $24,612. ("NOPV") (Exhibit 7), based on reports that Plaintiff submitted as part of its Competent Authority Approval.

62. The NOPV alleges that Plaintiff committed three violations of the HMR based on a PHMSA inspector's review of five test reports that Plaintiff submitted to DOT dated June 30, 2017, August 14, 2018, January 13, 2019, and February 17 and September 28, 2020. NOPV Addendum A at 2-5.

63. The NOPV alleges that Plaintiff knowingly submitted test reports and that the reports contain inaccurate information. *Ibid*.

64. It does not, however, allege that Plaintiff knew or had reason to know that any aspect of any report was inaccurate at the time Plaintiff submitted it to DOT. *Ibid.*

A. **First Alleged HMR Violation**

65. The NOPV's first allegation concerns Plaintiff's June 30, 2017 and January 13, 2019 test reports, which certified certain "UN 1A1" 55-gallon metal drums as complying with the HMR. Among the tests performed as part of those certifications were drop tests[8] and stack tests.[9]

66. DOT reviewed the January 13, 2019 report and requested that Plaintiff redo the drop and stack tests for the UN 1A1 drums.

---

[8] A drop test consists of using a machine to drop a package on the prescribed sides, edges and corners from a height prescribed by the HMR and then assessing the package's structural integrity.
[9] A stack test consists of loading deadweight on top of the sample package and then assessing the package's structural integrity.

67.     Plaintiff complied and re-tested the drums to DOT's satisfaction and submitted a revised report to DOT on January 27, 2019. DOT accepted the revised report without further discussion.

68.     The NOPV alleges that Plaintiff's June 30, 2017 and January 13, 2019 reports falsely represented that the 55-gallon drums were successfully tested in accordance with the HMR's drop and stack test requirements. NOPV, Addendum A at 2.

69.     The NOPV specifically alleges that the drop test was not performed with the drums' centers of gravity placed vertically over the point of impact, and that the stack test loads were not evenly distributed across all test samples. *Id.* at 2-3.

70.     The NOPV does not allege that Plaintiff knew or had reason to know that the drop and stack tests described in those reports did not satisfy HMR requirements at the time it submitted those reports to DOT.

71.     Nor did the NOPV mention that Plaintiff immediately re-tested the drums at DOT's request and submitted a revised report to DOT on January 27, 2019.

72.     Nor did the NOPV mention that any possible civil penalty arising from Plaintiff's June 17, 2017 test report is time-barred by 28 U.S.C. § 2462. ("[A]n action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued.").

**B.**     **Second Alleged HMR Violation**

73.     The NOPV's second alleged violation concerns Plaintiff's February 17, 2020 test report, which certified three-ply "5M2" paper bags manufactured by the Austin Powder Company ("Austin Powder") as complying with the HMR.

74.     Among other conditions, The HMR requires "5M2" paper bags to be water resistant. 49 C.F.R. § 178.521(b)(2). But it does not prescribe a standard or metric for water resistance that could be tested.

75.     Plaintiff did not test—and could not have tested—Austin Powder's "5M2" bags to ensure compliance with the HMR's non-existent water resistance standard.

76.     Because the HMR does not provide a testable water-resistance standard, industry practice is for the manufacturer to be responsible for water resistance. Austin Powder represented that its bags were made of a water-resistant "Wet Tear Strength" material and thus were water resistant.

77.     According to the NOPV, PHMSA Inspector, Ted Turner, inspected Austin Powder in July 2021 and claimed that Austin's "5M2" bags were not water resistant.

78.     The NOPV alleges that Plaintiff falsely certified Austin Powder's "5M2" bags it tested in February 2020 as being water resistant because Turner determined Austin Powder's bags lack a water-resistant outermost ply and a waterproof seam.

79.     The NOPV does not say what standard the HMR requires for an outermost ply to be water-resistant or for a seam to be waterproof because no such standards exist.

80.     Nor does the NOPV allege that Plaintiff knew or should have known Austin Powder's "5M2" bags did not meet those nonexistent standards when it filed the February 17, 2020 report.

### C.     Third Alleged HMR Violation

81.     The NOPV's third alleged violation concerns Plaintiff's August 14, 2020 and September 28, 2020 test reports, which tested bag designs manufactured by Austin Powder. It alleges that descriptions of bags in those reports did not match actual bags Turner observed during his inspection of Austin Powder two years later.

82.     According to the NOPV, the test reports "described bags of identical diameters, one with a side seam and one without a side seam. The report[s] indicated the fabric tapes per 100mm was identical for each bag and [each bag] had identical closure methods" NOPV at 4-5. It then states that, while inspecting Austin Powder in July 2022, Turner "observed physical samples of the bags which showed differing numbers of fabric tapes per 100mm and differing closure methods." *Ibid.*

83.     The NOPV does not specify how much difference existed between the descriptions in Plaintiff's test reports and the actual bags Turner observed in terms of "fabric tapes per 100mm" and "closure methods." Nor did it say how the Chief Counsel concluded that any such difference is attributable to knowing inaccuracies in Plaintiff's test reports.

84.     The NOPV's characterization of Plaintiff's reports is inaccurate because nothing in the August 2020 and September 2020 reports states all bags tested were identical. Rather, the reports contain photographs of the different bags tested and separately described each bag design. The report also restated closing instructions provided by Austin Powder.

85.     The NOPV does not allege Plaintiff knew or had reason to know that descriptions of bags tested in the reports were inaccurate, to the extent any inaccuracies exist.

86.     Nor does the NOPV allege that Plaintiff knew or should have known that Austin Powder's instructions for bag closure, which Plaintiff restated in the August 2020 and September 2020 reports, were in any way inaccurate.

87.     Plaintiff requested a formal hearing before an ALJ in accordance with 49 C.F.R. § 107.319 to adjudicate the allegations in the NOPV.

88.     On May 17, 2023, ALJ Douglas M. Rawald appointed himself to preside over the hearing. Procedural Order, PHMSA-2023-0038 (May 17, 2023) (Exhibit 8).  He ordered the parties to submit a joint report regarding the schedule on or before June 30, 2023, and to appear at a prehearing conference on July 11, 2023. *Id*. at 1-2.

## CLAIMS FOR RELIEF

### Count I: Violation of Article II of the U.S. Constitution
**Appointments Clause**

89.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

90.     DOT's ALJs are "Officers of the United States" whom Article II's Appointments Clause requires to be appointed by the President or an agency head. *Lucia*, 138 S. Ct. 2044. This requirement "maintains clear lines of accountability—encouraging good appointments and giving the public someone to blame for bad ones." *Id.* at 2056 (Thomas, J., concurring).

91.     Such accountability requires appointments to be public, so the public knows whom to reward or blame.

92.     There is no publicly available evidence that ALJ Rawald has been lawfully appointed as an Officer of the United States by the President or Secretary.

93.     Nor is there publicly available evidence that PHMSA's Chief Safety Officer has been lawfully appointed.

16

94.     ALJ Rawald and Chief Safety Officer McMillan thus lack lawful power to preside over Plaintiff's administrative proceeding.

95.     Even if secret (and therefore unaccountable) appointments of ALJs were permitted under *Lucia*, the post-*Lucia* ratification of ALJ Rawald's and Chief Safety Officer McMillan's appointments would have been performed by a Secretary who lacked power to remove them. 5 U.S.C. §§ 7521(a) and 7543(a), (b), (d). Such ratifications fail to satisfy the Appointments Clause because the removal protection means the Secretary could not reasonably decide not to ratify their appointments.

96.     Moreover, any ratification of ALJ Rawald's appointment would have come from a Secretary who could select only candidates approved by OPM. 5 C.F.R. § 930.204(a). That appointment would have been invalid because the Secretary lacked full power to appoint whomever he or she wanted.

97.     Even if Chief Safety Officer McMillan were properly appointed by the Secretary under *Lucia*, he still would be only an "inferior officer" who must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. U.S.*, 520 U.S. 651, 663 (1997). An inferior officer may not exercise unsupervised power to issue final agency decisions. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1984-85 (2021).

98.     Yet, Chief Safety Officer McMillan has been delegated authority to decide administrative appeals as final agency decisions without any supervision by a principal officer. Indeed, there has been no principal officer in the agency who could possibly supervise him since January 2021.

99.     Even if Chief Safety Officer McMillan has been properly appointed as an inferior officer, PHMSA's administrative proceedings would still be illegitimate because the authority to issue final agency adjudications has been delegated to an unsupervised inferior officer.

100.    "[B]eing subjected to an illegitimate proceeding, led by an illegitimate decisionmaker," *i.e.*, ALJ Rawald and Chief Safety Officer McMillan, inflicts a "here-and-now injury" upon Plaintiff. *Axon*, 143 S. Ct. at 893.

101.    The Court should enjoin DOT's administrative proceeding against Plaintiff and declare such proceedings to be unconstitutional.

<u>**Count II: Violation of Article II of the U.S. Constitution**</u>
**Take Care Clause**

102.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

103.    Article II, Section 3's "take Care" clause requires the President to "take Care that the Laws be faithfully executed." He "cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Free Enter. Fund*, 561 U.S. at 484.

104.    DOT's ALJs are "Officers of the United States" who may be removed only for good cause as determined by the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7521(a). The Secretary, who has power of appointment over ALJs, thus cannot remove ALJs without approval from MSPB. MSPB board members themselves can be removed by the President only for good cause. 5 U.S.C. § 1202(d).

105.    This multilevel protection from removal "is contrary to Article II's vesting of the executive power in the President." *Free Enter. Fund*, 561 U.S. at 483.

106.     PHMSA's Chief Safety Officer, who hears administrative appeals from ALJ decisions, is an SES employee who may be removed only for good cause as determined by the MSPB. 5 U.S.C. § 7543(a), (b), (d). MSPB members may be removed by the President only for good cause. 5 U.S.C. § 1202(d).

107.     This multilevel protection from removal is likewise contrary to Article II.

108.     An ALJ who enjoys unconstitutional removal protection will decide DOT's administrative proceeding against Plaintiff; and any appeal of the ALJ's ruling will be decided by a Chief Safety Officer who likewise enjoys unconstitutional removal protection. DOT's proceeding therefore violates Article II of the Constitution.

109.     "[B]eing subjected to an illegitimate proceeding, led by an illegitimate decisionmaker" inflicts a "here-and-now injury" upon Plaintiff. *Axon*, 143 S. Ct. at 893.

110.     The Court should enjoin DOT's administrative proceeding against Plaintiff and declare such proceedings to be unconstitutional.

**Count III: Violation of Article III to the U.S. Constitution**

111.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

112.     Article III, Section 1 of the U.S. Constitution states that the "judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Such language necessarily implies judicial powers shall not be vested in any other branch of government. Article III further provides for various protections for the judges of these Article III courts in order to guarantee judicial independence.

113.     "Under Article III, this "judicial Power shall extend to *all* Cases, in Law and Equity, arising under … the Laws of the United States" (emphasis added).

114.    The Supreme Court has held that cases implicating an individual's "private rights" must be tried before an Article III court. The "private rights" inquiry calls for a historical analysis that asks whether a case involves issues of the sort that historically would have been adjudicated in the courts or whether, instead, it involves issues that historically could have been resolved by the executive without any need for judicial involvement.

115.    An order to pay a civil monetary penalty implicates private rights because such a penalty would historically have been litigated in the common law courts. *See Tull v. United States*, 481 U.S. 412, 419 (1987); *see also Jarkesy v. SEC*, 34 F.4th 446, 452 (5th Cir. 2022).

116.    That is particularly true where, as here, liability is imposed only on a person who "knowingly violates" a legal standard. 49 U.S.C. § 5123(a). More broadly, an order to pay money to the government in the form of a civil monetary penalty affects a person's private rights because it results in the confiscation of their private property.

117.    By bringing a civil-enforcement action to impose a civil penalty against Plaintiff in an Article II tribunal before agency adjudicators, DOT violates Article III of the Constitution.

118.    "[B]eing subjected to an illegitimate proceeding" that deprives Plaintiff of its constitutional right to be tried in an Article III court inflicts a "here-and-now injury." *Axon*, 143 S. Ct. at 893.

119.    The Court should enjoin DOT's unlawful administrative proceeding against Plaintiff and declare such proceedings to be unconstitutional.

### Count IV: Violation of the Seventh Amendment to the U.S. Constitution

120.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

121.     The Seventh Amendment to the U.S. Constitution states that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

122.     "Suits at common law" includes all actions akin to those brought at common law at the time of the Seventh Amendment's adoption. *Tull*, 481 U.S. at 417.

123.     "A civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 421. Plaintiff is therefore entitled to a jury trial to adjudicate facts underlying any civil penalty DOT attempts to impose under 49 U.S.C. § 5123.

124.     DOT's administrative proceeding against Plaintiff does not provide for a jury trial. Rather, an ALJ acts as factfinder.

125.     "[B]eing subjected to an illegitimate proceeding" that deprives Plaintiff of its constitutional right to a jury trial inflicts a "here-and-now injury." *Axon*, 143 S. Ct. at 893.

126.     The Court should enjoin DOT's unlawful administrative proceeding against Plaintiff and declare such proceedings to be unconstitutional.

<u>Count V: Violation of the Fifth Amendment to the U.S. Constitution</u>
**Biased Adjudicator**

127.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

128.     The Fifth Amendment of the Constitution provides that: "No person shall be … deprived of life, liberty, or property, without due process of law."

129.     "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). A fair tribunal requires an unbiased and impartial adjudicator. *Ibid*. This requirement "applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

130.    Under DOT's administrative adjudication scheme, a PHMSA employee—Chief Safety Officer McMillan—has the final say on PHMSA's civil-penalty claim against Plaintiff.

131.    The Chief Safety Officer serves on the senior executive team alongside PHMSA's Chief Counsel, who is prosecuting Plaintiff for allegedly violating the HMR. Chief Safety Officer McMillan also serves as PHMSA's Executive Director and in that capacity is responsible for the overseeing operations PHMSA-wide, including the agency's investigation and enforcement action against Plaintiff.

132.    The Chief Safety Officer thus serves as judge in a proceeding in which his employer has an interest, and in which his co-worker serves as prosecutor.

133.    The current Chief Safety Officer unsurprisingly has never ruled against PHMSA, his employer, in administrative proceedings.

134.    The Chief Safety Officer is not an impartial adjudicator in the administrative civil-penalty action against Plaintiff because he is employed by the prosecuting party and is a teammate of the agency's chief prosecutor. *In re Murchison*, 349 U.S. at 136 ("no man is permitted to try cases where he has an interest in the outcome").

135.    He is also improperly serving as an adjudicator in an enforcement matter that he oversees as PHMSA's Executive Director. *See Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016).

136.    "[B]eing subjected to an illegitimate proceeding" that deprives Plaintiff of its constitutional right to due process of law inflicts a "here-and-now injury." *Axon*, 143 S. Ct. at 893.

137.    The Court should enjoin DOT's unlawful administrative proceeding against Plaintiff and declare such proceedings to be unconstitutional.

## Count VI: Violation of the Fifth Amendment to the U.S. Constitution
### Inadequate Due Process of Law

138.   Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

139.   In an adjudication to determine whether the government may subject the accused to punishment, due process of law requires the government to disclose exculpatory evidence in its possession as a matter of course. *Brady*, 373 U.S. 83 (holding voluntary disclosure was necessary for the "avoidance of an unfair trial to the accused").

140.   Due process of law requires *Brady* disclosures in civil enforcement proceedings as well as criminal cases. *See Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966) ("[T]he essentials of due process at the administrative level require similar disclosures by the agency … [i]n civil actions[.]").

141.   DOT adopted safeguards articulated in the Bradbury Memo to "ensure DOT enforcement actions satisfy principles of due process[.]" Bradbury Memo at 1. These due-process safeguards included a requirement that agency prosecutors must disclose exculpatory material to the accused in accordance with principles laid out in *Brady v. Maryland*. *Id*. at 9-10.

142.   Until April 2023, the Bradbury Memo was publicly available on DOT's website and continued to represent to respondents in the Department's civil penalty proceedings that *Brady* rights and certain other enumerated due process protections would be provided to them.

143.   DOT deactivated the web link to the Bradbury Memo in April 2023. At the same it, and without any public announcement, DOT placed on its website the Putnam Memo, which purported to rescind the Bradbury Memo's duty to disclose exculpatory material. While the Putnam Memo was dated September 2022, it was not publicly available until April 2023.

144.    On information and belief, DOT replaced the Bradbury Memo *sub silentio* with other guidelines to govern its enforcement proceedings, including the proceeding against Plaintiff.

145.    Because DOT has rescinded its duty to disclose exculpatory material, its administrative proceeding against Plaintiff does not satisfy constitutional due process of law and thus violates the Fifth Amendment and should be enjoined.

146.    DOT's new enforcement guidelines fail to adopt key protections guaranteed under the Bradbury Memo, and do not adequately ensure due process of law, including, *inter alia*, by rescinding the duty to disclose exculpatory evidence as a matter of course.

147.    The Court should issue a declaratory judgment confirming that DOT has as due-process duty to disclose exculpatory material as a matter of course.

### Count VII: Violation of the Administrative Procedure Act
**Exceeding Statutory Authority**

148.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

149.    DOT is an agency subject to the requirements of the APA.

150.    DOT's civil-enforcement regulation at 49 C.F.R. § 107.307 is a final agency action that is subject to judicial review under the APA.

151.    A court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2).

152.    Congress made clear that DOT is authorized to seek a civil penalty only against a "person that knowingly violates" the HMR. 49 U.S.C. § 5123(a)(1).

153.    The civil-enforcement regulation at 49 C.F.R. § 107.307, however, authorizes DOT to seek a civil penalty against a person who "knowingly engages in conduct which is a violation"

of the HMR, regardless of whether that person knew or should have known the conduct violates the HMR.

154.    It thus exceeds the statutory authorization granted by Congress in 49 U.S.C. § 5123 and must be set aside.

155.    DOT relied on the unlawful civil-enforcement regulation at 49 C.F.R. § 107.307 to seek a civil penalty against Plaintiff without alleging that Plaintiff knew or should have known that reports it submitted contained inaccuracies. *See* NOPV.

### Count VIII: Violation of the Administrative Procedure Act
**Arbitrary and Capricious Agency Action**

156.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

157.    On information and belief, DOT claims to have withdrawn the protections enumerated in the Bradbury Memo *sub silentio*.

158.    The rescission and replacement of the Bradbury Memo (and its codifying regulations) injures Plaintiff because Plaintiff will be forced to proceed in an administrative proceeding with insufficient due-process protections. Being subject to such an "illegitimate proceeding" inflicts a "here-and-now injury." *Axon*, 143 S. Ct. at 893.

159.    The rescission and replacement of the Bradbury Memo (and its codifying regulations) is final agency action subject to review under the Administrative Procedure Act. See 5 U.S.C. § 706; *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) (reviewing agency's rescission of memorandum regarding enforcement policy).

160.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

161.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (cleaned up).

162.    Agency action also is arbitrary and capricious if it "failed to consider an important aspect of the problem." *Ibid*. When changing policy, the agency must "show that there [were] good reasons for the new policy" and supply "a reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).

163.    DOT purported to rescind the Bradbury Memo and replace it with the Putnam Memo in September 2022, but did not at that time articulate that a policy change had taken place. The Putnam Memo was not made publicly available until April 2023.

164.    DOT made no attempt to explain why it replaced and rescinded the due-process safeguards mandated by the Bradbury Memo (and its codifying regulations). It did not even publicly acknowledge that a policy change had taken place until months after the purported rescission.

165.    As such, the replacement is arbitrary and capricious and should be set aside.

### **RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests this Court issue the following relief:

A.  A declaration that non-public appointments of DOT's ALJs and PHMSA's Chief Safety Officer violate Article II's Appointments Clause;

B. A declaration that the appointments of DOT's ALJs and PHMSA's Chief Safety Officer violate Article II's Appointments Clause because the Secretary was not free to appoint his preferred candidates and could not remove candidates he did not wish to appoint.

C. A declaration that the delegation of the authority to issue final agency adjudications to an inferior officer, such as PHMSA's Chief Safety Officer, violates Article II's Appointments Clause;

D. A declaration that multi-layered tenure protection for DOT's ALJs and PHMSA's Chief Safety Officer violates Article II's Take Care Clause;

E. A declaration that DOT's administrative proceedings violate Article III of the Constitution.

F. A declaration that DOT's administrative proceedings deprive Plaintiff of its Seventh Amendment right to a jury trial on civil penalty claims;

G. A declaration that DOT's administrative proceedings deprive Plaintiff of its Fifth Amendment right to due process of law.

H. An injunction to prohibit DOT from subjecting Plaintiff to an illegitimate administrative proceeding that suffers from constitutional defects;

I. A declaration that DOT's civil-enforcement regulation at 49 C.F.R. § 107.307(a) exceeds the statutory authority to seek a civil penalty against only persons who knowingly violate the HMR;

J. An order vacating 49 C.F.R. § 107.307(a);

K. An injunction to prohibit DOT from subjecting Plaintiff to an illegitimate administrative proceeding brought under an unlawful civil-enforcement regulation;

L. A declaration that DOT's purported rescission of due-process safeguards in the Bradbury Memo (and codifying regulations) was unlawful;

27

M. An order setting aside DOT's new enforcement procedures that purport to replace the Bradbury Memo;

N. Any other relief as the Court deems just and equitable, including reasonable attorney's fees and costs.

<u>**JURY DEMAND**</u>

Plaintiff demands a trial by jury of any triable issues.

Dated: June 26, 2023          Respectfully submitted,

*/s/David T. Bules*
David T Bules (0083834), Trial Attorney
CALFEE, HALTER & GRISWOLD LLP
2800 First Financial Center
255 East Fifth Street
Cincinnati, OH 45202
Telephone: (513) 693-4892
Facsimile: (513) 842-7028
mailto:dbules@calfee.com

Sheng Li, *pro hac vice* forthcoming
Kara Rollins, *pro hac vice* forthcoming
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
sheng.li@ncla.legal

Jerry W. Cox, *pro hac vice* forthcoming
Potomac Strategy Associates
14561 Sterling Oaks Dr.
Naples, FL 34110
Telephone: (703) 757-5866
jcox@potomacstrategyassociates.com

*Attorneys for Plaintiff gh Package Product Testing and Consulting, Inc.*

29